503 A.2d 417

**Leo M. BUNDY**

v.

**NATIONAL SAFETY LIFE INSURANCE
COMPANY, Appellant.**

Superior Court of Pennsylvania.

Argued Sept. 11, 1985.

Filed Nov. 29, 1985.

Reargument Denied Jan. 31, 1986.

James H. Devittorio, Ridgway, for appellant.

Before OLSZEWSKI, POPOVICH and MONTGOMERY, JJ.

POPOVICH, Judge:

This is an appeal from the order of the Court of Common Pleas of Potter County, later reduced to judgment, in favor of Leo M. Bundy, appellee, and against National Safety Life Insurance Co., appellant, in the principal amount of $7,213.15 plus interest. We affirm and modify.

The facts, viewed in a light most favorable to the verdict-winner and drawing all reasonable inferences therefrom, reveal that on March 7, 1980 Mr. Bundy sustained a head injury (commonly referred to as "whip-lash") when the vehicle he was driving struck another vehicle broadside.

Mr. Bundy filed proof of loss with his insurance carrier/appellant, claiming that he was "wholly and continuously disabled". With the filing of such documents, the insurer made payments for the following periods of disability: March 9–31, 1980; April 1—June 1, 1980; and June 2—September 4, 1980. Thereafter, National terminated payment of benefits upon learning from a Dr. Li that Bundy had been "released to return to work" as of September 4, 1980.

However, because the stress of hauling 80–100 pounds of gun powder up a flight of stairs caused a re-occurrence of Bundy's headaches and neck pains, the job which Bundy

was able to secure lasted no longer than 4 hours. The same inability to carry heavy objects precluded the claimant from returning to his job as "parts-runner" with Givens' junkyard—the position he held at the time of the accident.

With the aid of counsel, Bundy submitted a supplemental claim on August 27, 1982 seeking reinstatement of his disability benefits beginning with March 18, 1981 to August 17, 1982. Attached to the claim were two documents. The first, captioned "Attending Physician's Supplementary Report", was filled out by a Dr. Chaudhuri, who wrote that, based on some 12 monthly office visits starting on 6/18/81 for treatment, his patient (Bundy) was totally disabled from performing any duties of his employment "from 3/18/81 to unknown".

The second writing was authored by a Dr. A.B. King. He suspected, based on the manner in which Bundy sustained injury—striking his head against the windshield and breaking it—that damage to the cervical spine (discs C5 and C6) had occurred since the pulling of a "lot of ligaments is not at all surprising." Given that Bundy's symptoms had lasted so long they tend to become chronic and go on for years, according to Dr. King. Thus, he advised that Bundy be evaluated further and "corrective measures [be] undertaken when discovered".

By letter dated September 9, 1982, National denied Bundy's request for additional benefits on the grounds that his return to work, when coupled with the fact that he did not commence seeing Dr. Chaudhuri until June 18, 1981, violated the policy of insurance, which required that one be "wholly and continuously disabled", confined to one's immediate premises and be regularly visited by a physician.

Bundy reacted by filing a complaint alleging, as is herein relevant, that National had breached its contract of insurance in failing to honor his claim for benefits "from September 5, 1980 to and including August 17, 1982". Thereafter, National filed a response in the form of an Answer and New Matter. Therein, National would admit to no more than that Bundy's injuries rendered him "wholly and contin-

uously disabled from the date of the said accident ... up and through September 4, 1980" and not thereafter. If Bundy was still convalescing, National contended, "such alleged disability was not of such [a] nature so as to be compensible [sic] under the terms of [the] ... contract of insurance". (Paragraph 6)

National expressly denied, in paragraph 11, that Bundy had submitted proper proof of entitlement to benefits for the period in question, and, in paragraph 14, asserted that the complaint was the first it learned of the claim.

Under New Matter, National stated that it ceased making payments to Bundy upon learning from his physician (Dr. Li) that he had been certified to go back to work, and that from October 22, 1980 until August 27, 1982, Bundy presented no proof of loss. Thus, National argued, Bundy had not presented any documentation warranting the payment of any claim and that Bundy's inaction from the date of the last payment (October 22, 1980) constituted a waiver of his right to seek now additional benefits.

In his "Reply", Bundy asserted that he had provided proper documentation to National to recover for his disability, and that he had not acquiesced to the denial of his claim by failing to object thereto. Also, Bundy noted that he did return to work subsequent to receiving certification from his doctor, however this did not take place after the alleged final payment from National.

At the time set for the non-jury trial, Bundy recalled how he sustained a head injury in March of 1980 in an automobile collision, that his neck and shoulder began to bother him thereafter and that his right arm became numb so as to prevent him from gripping objects with any force. He also complained of getting headaches 2 or 3 times a week, that sometimes they lasted 3 or 4 days and were brought on either with a quick movement of his head or for no apparent reason. They were so severe, Bundy stated, that he would rub his head until blood came out in an effort to relieve the pain. Another symptom of the injury was the enduring of

back pains by Bundy so "fierce" that they brought tears to his eyes if he had to "even straighten up".

Bundy's typical day, as far as what physical exertion he engaged in, consisted of, as stated by him:

I sit and watch t.v., I get up and walk around the house, go and visit my neighbors, go outside and walk around outside, watch the kids feed their animals.

Any physical work around the house is performed by his step-son or he has to hire others to do things for him. Bundy complained that if he tried to bend or stoop he becomes "dizzy", and on two occasions he fell from bending over and injured his ribs. The witness has experienced neck problems if he sleeps improperly or misjudges a step. He experiences "terrific headache[s] and it bothers [his] neck something fierce [to the point where he] don't get no sleep at all."

Bundy also remarked that his neck snaps since the accident. This causes him pain and is "getting worse and worse as it goes along. It is happening more to [him] now than it did back in 1980."

Bundy went on to recount that his inability to read or write and his 7th grade education relegated him to a 20-year work history, although varied, consisting of driving trucks, junk hauling, tool polishing, maintenance work and other unskilled jobs, all of which required heavy lifting, stooping and bending. Thus, he had not sought work, other than at the Joyce Power Co., since the accident on the recommendation of a Dr. Chaudhuri. Bundy's wife confirmed her husband's testimony.

The testimony of Dr. Chaudhuri (a consulting orthopedic surgeon at Charles Cole Memorial Hospital in Coudersport, Pa.), along with that of a Dr. Mosch (a board certified family practitioner and a member of the staff of Charles Cole Memorial Hospital), was presented in deposition form to the trial court.

On three of the six occasions when Dr. Mosch saw Bundy, i.e., October 27, November 4 and November 19 of 1980, the

patient complained of headaches related to an injury he sustained in an automobile accident. On the last visit in February of 1983, the patient had injured his ribs falling against a vehicle.

Dr. Mosch sent an abstract of Bundy's record to his attorney. The last paragraph read:

> I am, therefore, not able to give you any further information about his loss of time from work but it is clear from the records of 1980 [—October 27, 1980 through March 31, 1982] that on those visits he was working, at least part-time, but went home from work when he had the headache.

Although the doctor conceded that he never told Bundy not to work, he admitted that he was not cognizant of whether Bundy was under Dr. Chaudhuri's care during the same period or whether the patient had been certified as disabled or unable to be gainfully employed.

When counsel for National asked Dr. Mosch if he had an opinion, based on the three office visits, as to whether Bundy, to a reasonable medical certainty, was wholly disabled from performing any gainful occupation for which he might be qualified at that time to perform, he stated: "That during part of that time the patient would have been able to perform some gainful occupation."

However, on cross-examination by Bundy's counsel, the doctor opined further that:

> ... when [Bundy] had his severe headaches he would not then be able to fulfill the usual duties for which he might have been hired. He wouldn't be a full time employee when he had to leave because of the headache[s].
>
> *     *     *     *     *     *
>
> ... So during the time when he had the headaches he would have been incapable of full time employment.

A reading of Dr. Chaudhuri's deposition indicates that he first saw Bundy on March 18, 1981, which would have been during the period that Bundy was seeing Dr. Mosch.

Dr. Chaudhuri's examination of the patient disclosed that his range of motion of the cervical spine was limited to 20–30% of normal range. His left lateral flexion and right rotation was limited. There was evidence of paravertebral muscle spasm in the cervical spine, mainly on the right side. He had some sensory deficit of the entire right hand along the ulnar border, but it was not clear cut. Also, Bundy did have some atropy of the deltoid and tricep muscles.

Between the initial visit with Dr. Chaudhuri and July 22, 1982, Bundy was referred to two other neurosurgeons (Dr. Okawara of the Medical Center at the University of Rochester and Dr. King of the Guthrie Clinic in Sayre, Pa.) and a Dr. Baska, who operated a pain clinic. Based on the correspondence received from these doctors, Dr. Chaudhuri testified:

> ... we do not have an exact diagnosis as yet. We do feel that he has problems and he would require investigations. Until you come to investigations you don't know exactly what he has, but he has symptoms and signs, and we feel that he has soft tissue injury to the cervical spine from which he is suffering.
>
> \* \* \* \* \* \*
>
> I did not feel until we solved his problems and until he was asymptomatic he could go to work.

The doctor noted that since he first saw Bundy, "I don't think he has made any significant improvement." Bundy "has got weakness of the right hand; he has restriction of neck movement; and that basically has remained unchanged."

Although Dr. Chaudhuri's admission of Bundy to the hospital for 4 days in May of 1981 for continuous traction, followed by home treatment with intermittent traction, did improve the patient's condition so as to allow him to bend and lift some, he cautioned, in regard to the cervical spine injury:

> This is an ongoing problem, as I told you. It has been waxing and waning. When the patient's symptoms get worse we advise him to be more careful. When his

symptoms improve then we ask less [sic] careful. Basically his symptoms have been waxing and waning and you know there are sometimes when he came with severe pain and at that time we would restrict any lifting in any way. When his symptoms improve he can lift some.

Additionally, in response to a question regarding Bundy's testimony at trial that he was getting "worse" and the doctor's "waxing and waning" theory, Dr. Chaudhuri answered:

Well, his symptoms are getting more frequent, you know, or acute; there are more frequent attacks than before. He seems to be seen [by me] more and more often than before.

Lastly, when posed with the question of whether the patient's condition was caused, to a reasonable medical certainty, by the automobile accident, Dr. Chaudhuri responded, "... it is conceivable that his symptoms have resulted from his accident."

After the record was closed, the trial court granted National's motion for a compulsory non-suit for Bundy's failure to establish through his medical testimony (produced in deposition form) that there existed "a causal relationship between the accident and the ultimate injuries and symptoms as endured by the plaintiff." (Trial Court Opinion filed December 6, 1983, at page 5) The trial court went on to note that National's payment of Bundy's claim for the period between March 9 and September 4, 1980 did not constitute an "admission by payment" dispensing with the presentation of proof establishing a disability on Bundy's part for the time thereafter.

Following the submission of a petition for reconsideration and a hearing thereon, the trial court reversed its initial order and found in favor of Bundy. It did so by concluding that:

... if the causal connection between trauma and initial injury is *admitted*, and payment is made thereunder by the defendant insurance company, all that is needed to recover for payments due under [the] policy after the

insurance company stopped payment to the plaintiff is testimony that the symptoms suffered by the plaintiff are the same or worse in kind and degree as he suffered from the initial injury to the date the payment was stopped. Certainly the evidence presented by the plaintiff, viewed in the light most favorable to the plaintiff, in the instant case, would satisfy that requirement.

(Trial Court Opinion filed April 23, 1983, at pages 2–3) (Emphasis added)  The admission the trial court made reference to in its Opinion appeared in paragraph 6 of National's Answer to Bundy's complaint, wherein National stated that Bundy had sustained personal injuries as a result of an automobile accident and was rendered "wholly and continuously disabled from the date of said accident, March 7, 1980, up and through September 4, 1980".  The trial court found that the aforecited was sufficient to establish the link between the accident and injury to entitle Bundy to the relief requested.

Post-trial motions and a hearing followed to consider National's argument to reverse the order and ultimate judgment entered in favor of Bundy.  The trial court was not persuaded and denied National's motions.  This appeal followed.

■  The first two issues raised by National question the sufficiency of the evidence.  In particular, that the appellee failed to establish that he was "wholly and continuously" disabled from performing any occupation which he might ordinarily be capable of performing.

Language similar to that appearing in the policy under consideration here [1] has not been interpreted with such

---

1.  The pertinent portions of the insurance policy read:
### THE INSURING CLAUSE
**Part I**
   This policy insures against loss, as herein limited and provided, from accidental bodily injury sustained while driving or riding within any automobile, truck or bus for business or pleasure during the term of this policy, provided such injuries are caused solely by reason of collision or upset of automobile, truck or bus and not excluded under Part V (exclusions and limitations).

rigidity that a claimant must be a helpless invalid in order to recover benefits.

In *Cooper v. Metropolitan Life Insurance Co.*, 317 Pa. 405, 177 A. 43 (1935), where the policies provided that disability payments were to be made if the insured should become wholly and continuously disabled "from engaging in any and every occupation or employment for wage or profit", our Supreme Court defined the perimeters of permanent disability in a common sense fashion which has become the benchmark against which the grant or denial of one's claim is assessed. The *Cooper* Court said:

> While the words of the policy must receive reasonable construction and, literally interpreted, the words 'total disability' to engage 'in any and every occupation of employment for wage or profit' would require that an insured be a helpless invalid before he would be entitled to benefits under the policy, this cannot be what the parties intended. It is rare that any man is incapacitated from doing some work; many a blind man weaves baskets; a man with both legs and one arm off can sit in a doorway and sell lead pencils, or act as a telegraph operator; but it cannot well be argued that either is not totally disabled.

317 Pa. at 408, 177 A. at 44. See also *Pearlman v. Metropolitan Life Insurance Co.*, 336 Pa. 444, 448, 9 A.2d 432, 434 (1939), wherein the same Court, interpreting a similar provision of a life insurance policy, wrote: A claimant under such a policy is not

### INDEMNITIES

**Part II**

### MONTHLY ACCIDENT DISABILITY BENEFITS

If "Such Injuries" as described in Part I and not hereinafter excepted in Part V (Exclusions and Limitations) shall immediately thereafter wholly and continuously disable the Insured and prevent the Insured from performing any and every duty pertaining to any business or occupation, and if as a result thereof the Insured is confined to his immediate premises and requires regular visits by a legally licensed medical or osteopathic physician or surgeon (at home or physicians office), the Company will pay the Insured for each day of such continued disability at the rate of the Monthly Accident Benefits for a period of sixty (60) months.

barred from recovery because he may be able to perform a few trivial and desultory acts or light work of a limited character and at irregular intervals, but it does mean that it is not enough for the insured to show that he is unable to do a substantial part of his ordinary work.

In like fashion, the Supreme Court of the United States said in *Lumbra v. United States*, 290 U.S. 551, 559, 54 S.Ct. 272, 276, 78 L.Ed. 492 (1934):

"Total disability" does not mean helplessness or complete disability, but it includes more than that which is partial. "Permanent disability" means that which is continuing as opposed to what is temporary. * * * The mere fact that one has done some work after the lapse of his policy is not of itself sufficient to defeat his claim of total permanent disability. He may have worked when really unable and at the risk of endangering his health or life. * * * It may be assumed that occasional work for short periods by one generally disabled by impairment of mind or body does not as a matter of law negative total permanent disability.

Similarly, it has been rightly held that "an insurance company cannot conjure up some imaginary occupation for its insured and defend upon the phantasy of its own creation ...." *Cobosco v. Life Assurance Co. of Pa.*, 419 Pa. 158, 164, 213 A.2d 369, 372 (1965), quoting *Moskowitz v. Prudential Insurance Co. of America*, 154 Pa.Super. 362, 365, 35 A.2d 567, 569 (1944).

Instantly, we had testimony that Bundy was authorized to return to work by his then doctor. However, his effort proved futile because the amount of manual labor required at the Joyce Powder Co. aggravated his injury and brought on a re-occurrence of his debilitating headaches to the point where he had to leave the job-site after just a half-day of work. We find "this interval in his enforced idleness would not, from a legal standpoint, impair the totality of his disability." *Pearlman v. Metropolitan Life Insurance Co., supra*, 336 Pa. at 448, 9 A.2d at 434 (Citations omitted).

Unlike the trial court, we are not inclined to discount the deposition testimony of Doctors Chaudhuri and Mosch, not to mention the exhibits admitted by Bundy regarding the views of several doctors (e.g., Okawara and King) relating to his disability and recommendations for continuing evaluation and treatment.

Admittedly there were statements in the deposition of Dr. Mosch insinuating that the claimant was working part-time during the period when he claims he was totally disabled. This was in stark contrast to the testimony of Mr. Bundy that after the debacle at the Joyce Powder Co. he curtailed his efforts to seek any other type of employment. With the clear cut issue of fact facing the trial judge who heard the claimant's version, we find the evidence sufficient in quantity and quality to have the matter resolved by the trier of fact. See *Wuerfel v. Metropolitan Life Ins. Co.*, 343 Pa. 291, 22 A.2d 747 (1941); *Sebastianelli v. Prudential Ins. Co. of America*, 337 Pa. 466, 12 A.2d 113 (1940); *Woolford v. Equitable Life Assur. Soc. of United States*, 149 Pa.Super. 225, 27 A.2d 411 (1942); *Milich v. Metropolitan Life Ins. Co.*, 145 Pa.Super. 430, 21 A.2d 458 (1941).

In the same vein, we note that National's belief that Bundy, based on his 20-year work history, should be able to find some employment commensurate with his inability to lift heavy objects above his shoulders is, we believe, specious, "as plaintiff's claim would not be defeated merely because he might be able to perform some kinds of occupation, and as [National] did not specify the 'forms' of occupation [it] had in mind" the ruling of the trial court will not be overturned. See *Sebastianelli v. Prudential Ins. Co. of America, supra*, 337 Pa. at 467, 12 A.2d at 114. In fact, the lack of specificity on the part of National's counsel as to what job Bundy could perform, notwithstanding his inability to return to the position he held with Givens' junkyard, precluded Dr. Chaudhuri from offering an opinion during his deposition as to what other work the claimant would/could be able to engage in.

Furthermore, the fact that the claimant had an injury which the doctors were not able to diagnose with certainty, and, therefore were unable or unwilling to express a positive opinion as to whether the disability would be permanent, would not prevent a recovery by the claimant. *Mirabella v. Metropolitan Life Ins. Co.*, 143 Pa.Super. 500, 18 A.2d 474 (1941). The trier of fact, the trial judge here, found that Bundy was not capable of performing the duties of any occupation, which he might be ordinarily capable of performing, or engaging in or carrying on any gainful business or occupation and himself performing an effective part of the work incident thereto. *Id.*; see also *Feigenbaum v. Prudential Ins. Co. of America*, 144 Pa.Super. 412, 19 A.2d 542 (1941). We see no reason to alter the trial court's decision.

■ The third issue proffered by the insurer is that the claimant failed to present "proof of loss" for the period "of September 5, 1980 through March 18, 1981."

We need only consider what the evidence shows that the claimant did, or caused to be done, to advise the insurer that the conditions had arisen in which he would be entitled to receive the disability benefits and what the insurer did with, or in consequence of, the information received. *Astrin v. Metropolitan Life Ins. Co.*, 341 Pa. 120, 123, 17 A.2d 887, 888 (1941).

On the insurance policy was printed the following instruction:

**Notice of Claim:** Written notice of injury on which claim may be based must be given to the company within twenty days after the occurrence or commencement of any loss covered by the policy, or as soon thereafter as is reasonably possible. Notice given by or on behalf of the insured or the beneficiary to the Company, its Home Office, Philadelphia, Pennsylvania, or to any authorized agent of the Company with information sufficient to identify the insured, shall be deemed notice to the Company.

**Claim Forms:** The Company upon receipt of such notice, will furnish to the claimant such forms as are usually furnished by it for filing proofs of loss. If such forms are not so furnished within fifteen days after receipt of such notice, the claimant shall be deemed to have complied with the requirements of this policy as to proof of loss upon submitting within the time fixed in the policy for filing proofs of loss, written proof covering the occurrence, character and extent of the loss for which the claim is made.

**Proofs of Loss:** Written proof of loss must be furnished to the Company at its said office within ninety days after the date of such loss. Failure to furnish such proof within the time required shall not invalidate nor reduce any claim if it shall be shown not to have been reasonably possible to give proof within such time, provided such proof is furnished as soon as reasonably possible, and in no event, except in the absence of legal capacity later than one year from the time proof is otherwise required.

It is undisputed that from the date of the accident until September 4, 1980, the claimant had provided the insurer with sufficient proof of loss to warrant his receipt of benefits. It was only when Dr. Li, the claimant's physician at the time, certified that Bundy could return to work that the insurer stopped making payments. At this juncture it is appropriate to observe that it was proper for the insurer to cease making payments, with "the right subsequently to arrive at a different conclusion, if the facts warranted it." *Mirabella v. Metropolitan Life Ins. Co., supra,* 143 Pa.Super. at 505, 18 A.2d at 477.

In his brief to us at pages 9–10, counsel for Bundy acknowledges that the submission of proof of loss for September 4, 1980 through March 18, 1981 was sent to Bundy's physician for his signature on August 6, 1981, and that "Dr. Chaudhuri apparently did not complete nor send [it] back to the insurer." Counsel then argues that because National had the means by which to determine Bundy's physical condition, and, in fact, did so through their Doctor

Michael Skovron who prepared a report dated May 13, 1982 on his condition, that the requirements of the policy of insurance were met. We find this to be fatuous.

To begin with, the insurance policy specifically requires that the insured provide proof of loss for the period he/she seeks benefits. It is nowhere written that the insurer has the obligation to expend time and money to seek out and examine its insured to see if he/she is entitled to coverage. Moreover, Dr. Skovron's report was not favorable to Bundy. Rather, it concluded that he was not disabled. Accordingly, we fail to see the logic or sense in counsel's argument.

It is true that where an insurer rejects a claim as not compensable, but it finds no fault with the manner in which the proof was presented nor with its substance, the cases require that the proof must be treated as sufficient to justify payment. *Astrin v. Metropolitan Life Ins. Co., supra.*

Here, we have no formal rejection by National of Bundy's claim covering September 5, 1980—March 18, 1981 because, simply put, no proof of loss was ever filed with the insurer for this period, at least from our assiduous review of the record. In fact, Dr. Chaudhuri confirmed that he neither signed nor mailed any such proof of loss statement to National on behalf of Bundy.

What evidence does appear of record on this matter discloses no more than the mailing to the insurer of an "Attending Physician's Supplementary Report" by Bundy on August 27, 1982. Even there, in response to question # 5, i.e., "Patient was totally disabled from performing any duties of his employment", Dr. Chaudhuri wrote only "from 3/18/81 to unknown".

Thus, albeit the sufficiency of the submission of proofs is for the trial court to determine (see *Union Trust Co. of Butler v. Guardian Life Ins. Co.*, 176 Pa.Super. 424, 107 A.2d 584 (1954)), we cannot affirm that which is not supported by the record. Since the trial court calculated that period between September 5, 1980 and March 18, 1981 in

arriving at its award, we will remand for a recalculation in light of our determination that proof of loss was established as of March 18, 1981, and not as of September 5, 1980. See *Milich v. Metropolitan Life Ins. Co., supra.*

■ Lastly, we address National's protestation that because Bundy was not confined to his immediate premises, a condition precedent to payment under the policy of insurance was not met. See note 1, *supra.*

In particular, National argues:

> ... the Plaintiff's excursions outside [ ]his home from September 5, 1980 to the date of trial were not in any manner connected with a physician's advice. Plaintiff testified under cross examination that he was not subpoenaed to trial. (R.R. at p. 134a) and that he did not need his physician's approval to attend trial. (R.R. at p. 134a). Moreover, Plaintiff admitted to not being confined to his household and, on the contrary, to walking, at times, twice a day a distance of two and one half blocks to the Valley Restaurant from September 1980 through the date of said restaurant's burning in December, 1982. (R.R. at p. 127a). Plaintiff also testified that he spent the evening of the restaurant's burning with his girlfriend at her second floor apartment. (R.R. at p. 109a); that he went hunting in the fall of 1981 (R.R. at pp. 110a–11a); that he drove himself to Olean, New York, to marry his present wife (R.R. at p. 109a), and that he drove to the courthouse on the date of September 6, 1983 trial of this matter. (R.R. at p. 134a). Plaintiff at no time specified that such outdoor activity was prescribed by his treating physicians. Indeed, Dr. Chaudhuri himself admitted that Plaintiff was in no manner confined to his premises and that he was "free to come and go as he pleases". (R.R. at p. 243a). Dr. Chaudhuri never indicated that he advised Plaintiff to be active outdoors in the manner of record in this case for therapeutic purposes or otherwise.

The law of this Commonwealth has never required that in order for a person to be labelled totally disabled he had to remain within the confines of his home or risk the likelihood

that his right to disability benefits would be denied. The principle is elaborated upon by our Supreme Court in *Albert v. Mutual Ben. Health & Accident Ass'n, Omaha*, 350 Pa. 268, 271–272, 38 A.2d 321, 322–323 (1944) (Emphasis added):

> We do not interpret the[ ] cases as holding that under insurance provisions such as [we have here] we are not interpreting continuous confinement "within doors" [a]s a sine qua non of the recovery of a claim under the policy. If such a literal interpretation of language is called for in these cases an insured who was "confined within doors" by an illness could not be carried "out doors" though the place of his "confinement" was on fire, without defeating his rights to recover benefits under the policy. Insurance policies, like statutes, must receive "a sensible construction". See on the question of "construction" the opinion this day filed by us in *McGregor v. Young Township*, [350 Pa. 93] 38 A.2d 313.

> *   *   *   *   *   *

Couch on Insurance, sec. 1678, p. 5791, says: " * * * it may be stated, as a general rule, that the provisions of a life, health, or accident policy requiring the insured to be confined to the house in order to be entitled to recover disability benefits do not have to be literally complied with; in other words, the insured is not required to remain continuously within the four walls of his home under every and all circumstances. * * * Furthermore, the words, 'continuously and necessarily confined in the house,' mean merely a substantial confinement, not that one should be so closely confined as to be unable to sit, or to go out occasionally to get fresh air or sunshine, or for some other purpose not inconsistent with the reasonable requirements, needs, or betterment of a sick person, * *; rather, the words must receive a reasonable application in view of the necessities of the case and attendant circumstances. * * * Thus, *total disability necessarily confining insured to the house does not require confinement continuously within the walls of a house, but refers to a condition of illness and disability,* * * *. American

Jurisprudence p. 883, sec. 1171, says: "While some courts have given a literal construction to a requirement that the insured be confined to the house, most courts have adopted the view that the provisions of a health or accident policy requiring the insured to be confined to the house do not have to be literally complied with in order to entitle the insured to indemnity. According to these courts, a person may be totally incapacitated and confined to his house within the meaning of a policy although he takes some exercise outdoors or visits his physician, *provided he is entirely incapacitated for work or business on account of his injury or illness.*"

In short, without going into an extended discussion of the facts, the sum and substance of which appear throughout this Opinion, we hold in accordance with the tenets espoused in *Albert* that Bundy's excursions outside the confines of his home do not cloud or negate the fact that "he is entirely incapacitated for work or business on account of his injury." [2]

**2.** It requires mentioning, inasmuch as the trial court and the litigants below were unclear on the matter, that the testimony of the claimant alone would not have been sufficient to establish his total disability.

Although a laywitness may testify as to certain matters involving health, and as to his obvious symptoms, his testimony must be confined to the facts within his knowledge, and may not be extended to matters involving the existence or non-existence of a disease, which is only discoverable through the training and experience of a medical expert. *Woolford v. Equitable Life Assur. Soc. of United States,* 149 Pa.Super. 225, 27 A.2d 411 (1942).

We do not believe that the injury sustained by the appellee is so immediately and directly, or naturally and probably, the result of the accident that the connection between them dispenses with the need that a professional or expert witness testify to it. Compare *Tabuteau v. London Guarantee & Accident Co.,* 351 Pa. 183, 40 A.2d 396 (1945). This was confirmed by Dr. Chaudhuri at his deposition, i.e., that headaches similar to those suffered by the claimant could have been the product of a tumor, and this would have shown up if the traction administered to the claimant had not reduced some of the pain.

Since there is no professional testimony regarding the claimant's condition between September 4, 1980 and March 18, 1981, we cannot rule that the evidence established the existence of a disability during such time. However, there is a preponderance of evidence to prove the presence of the disability from March 18, 1981 onward. *Moskowitz v. Prudential Ins. Co. of America,* 154 Pa.Super. 362, 35 A.2d 567

We affirm all but that portion of the trial court's actions relating to the amount of the award, and, accordingly, remand for a re-tabulation of the monies due and owing Bundy as more fully discussed herein. Jurisdiction is relinquished.

(1944). National's position is consistent with this finding in that it does not dispute a nexus between the injury and the disability. Rather, National argues at page 12 of its brief that the evidence presented no more than a "partial" disability.